IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **CHRISTINE S. FORD,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil No. 11-707-JPG-CJP |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| Defendant. ) | |

### REPORT and RECOMMENDATION

This Report and Recommendation is respectfully submitted to District Judge J. Phil Gilbert pursuant to **28 U.S.C. § 636(b)(1)(B)**.

In accordance with **42 U.S.C. § 405(g)**, plaintiff Christine S. Ford seeks judicial review of the final agency decision denying her Disability Insurance Benefits (DIB) pursuant to **42 U.S.C. § 423**.

### Procedural History

Plaintiff applied for disability benefits in August, 2008, alleging that she became disabled as of April 20, 2006. (Tr. 143). The application was denied initially and on reconsideration. After a hearing, Administrative Law Judge (ALJ) Robert G. O'Blennis denied the application on January 13, 2010. (Tr. 11-19). Plaintiff's request for review was denied by the Appeals Council, and the January 13, 2010, decision became the final agency decision. (Tr. 1).

Plaintiff has exhausted her administrative remedies and has filed a timely complaint in this court.

### Issues Raised by Plaintiff

Plaintiff raises the following issues:

(1) The hypothetical question posed to the vocational expert by the ALJ did not include all of the limitations which the ALJ assessed.

(2) The ALJ did not properly evaluate all of her limitations and did not include all limitations in his RFC assessment

(3) The ALJ erred in his determination of plaintiff's credibility.

### Applicable Standards

In order to receive DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, a person is disabled when he or she has the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §§ 423(d)(3).**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in

> past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

***Weatherbee v. Astrue***, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments (referred to as "the Listings") acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **See,** ***Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992);** ***Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993); 20 C.F.R. § 404.1520(b-f).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant has a severe impairment but does not meet or equal a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. ***Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).** The Commissioner bears the burden of showing that there are a significant number of jobs in the economy that claimant is capable of performing. **See,** ***Bowen v. Yuckert*, 482 U.S. 137, 146, 107 S. Ct. 2287, 2294 (1987);** ***Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).**

It is important to keep in mind the proper standard of review for this Court. "The findings

of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g).** Thus, the Court must determine not whether Ms. Ford was, in fact, disabled during the relevant time period, but whether ALJ O'Blennis' findings were supported by substantial evidence; and, of course, whether any errors of law were made. **See, Books v. Chater, 91 F.3d 972, 977-978 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir.1995)).**

This Court uses the Supreme Court's definition of "substantial evidence," that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971).** In reviewing for substantial evidence, the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, ***Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

### The Decision of the ALJ

ALJ O'Blennis followed the five-step analytical framework described above. He concluded that Ms. Ford had not engaged in substantial gainful activity since the alleged onset date. He found that she has severe impairments of elevated blood pressure, diabetes mellitus with peripheral neuropathy, obstructive sleep apnea, osteoporosis and obesity, which did not meet or equal a listed impairment. He concluded that her alleged depression and anxiety did not rise to the level of a severe impairment.

The ALJ concluded that plaintiff had the residual functional capacity (RFC) to perform a limited range of light work. Based on the testimony of a vocational expert (VE), the ALJ determined that she would be unable to do her past work of data entry clerk and telephone worker. Using the Grids, the ALJ determined that she was not disabled. In making this determination, the ALJ found that plaintiff's limitations had little or no effect on the occupational base of unskilled light work. (Tr. 11-19).

## The Evidentiary Record

This Court has reviewed and considered the entire record in formulating this Report and Recommendation. The following is a summary of some of the pertinent portions of the written record, focused on the issues raised by plaintiff. As Ms. Ford has not raised an issue with respect to her alleged mental limitations, the Court will not discuss that evidence in any detail.

**1.     Agency Forms**

Christina Ford was born in 1961 and was almost 45 years old on the alleged date of onset. (Tr. 159). At the time of her application, she was 4'11" tall and weighed 200 pounds. (Tr. 162). She was insured for DIB through December 31, 2011. (Tr. 157). She worked as a claim analyst for an insurance company from 1990 to April 20, 2006. This job involved entering data into a computer. (Tr. 164).

In a Disability Report, Ms. Ford said she was unable to control her diabetes, and that she had neuropathy and deteriorating vision. (Tr. 163). In a later report, she stated that she suffered from pain and fatigue, and did not have feeling in her feet. She said her vision had "deteriorated tremendously" and that she became confused and disoriented when her blood sugar was low. (Tr. 209).

**2.     Evidentiary Hearing**

Plaintiff was represented by an attorney at the evidentiary hearing on August 11, 2009. (Tr. 33).

Plaintiff had two years of college, but no degree. (Tr. 36). She worked full time doing data entry for an insurance company from 1991 through 2006. She also worked part-time selling phone systems. (Tr. 37-38). She had to stop working because she was missing so much time from work due to her diabetes. On April 19, 2006, she felt like she was having a heart attack, so she was sent to the hospital. She spent the night. Her employer "never did take [her] back." (Tr.38-39).

Ms. Ford testified that she was "just getting basic treatments" for her diabetes because she could not afford anything more. (Tr. 40). She testified that her pain pills interfered with her blood sugar control. (Tr. 41). She had neuropathy in her feet and hands. (Tr. 44). She used a CPAP machine for obstructive sleep apnea. (Tr. 44-45).

Ms. Ford testified that she did not do much during the day. She watched television, read, and sometimes wrote stories to entertain herself. She wrote long-hand. (Tr. 45-46). Her two grandchildren were staying with her. They were 4 and 11 years old at the time of the hearing, and had been staying with her for 2 years. She received food stamps for them. Ms. Ford testified that her daughter came over and did the children's laundry, but Ms. Ford fixed their meals. (Tr. 49-50).

According to plaintiff, her doctor wanted her to get some testing, but she could not afford to pay for it. She had disability insurance coverage, but no medical insurance coverage, and she had been turned down for Medicaid. (Tr. 47-48). In the past, she saw Dr. Thampy for her

diabetes, but she stopped going to him because he charged $125.00 per office visit. She was seeing Dr. Vaid for her diabetes at the time of the hearing. Dr. Vaid had recommended "surgeries or tests" but she could not afford them. (Tr. 57).

Plaintiff testified that she could stand for 10 to 15 minutes. She could lift a gallon of milk. Sitting caused her back and legs to hurt because of her neuropathy and osteoporosis. (Tr. 50-51). She said that she had pain in her feet, legs and hands. She took medications, which eased the pain but did not eliminate it. (Tr. 56). She could sit for 30 to 45 minutes. (Tr. 58-59).

Ms. Ford testified that she had problems with her hands. She could only write for 20 minutes before she had to stop. She could not type like she used to. (Tr. 58).

Brenda Young testified as a vocational expert. She testified that plaintiff's past work was sedentary and semi-skilled. (Tr. 63). The ALJ asked her to assume a person of Ms. Ford's age, education and work experience, with the following limitations:

- able to lift 20 pounds occasionally and 10 pounds frequently;
- stand and/or walk and sit for 6 hours in an 8 hour day;
- never climb ladders, ropes or scaffolds;
- occasionally climb ramps and stairs;
- occasionally balance, stoop, kneel, crouch and crawl;
- some diminution of ability to discriminate size, shape, temperature and texture of small items with the fingertips;
- undiminished ability to reach, handle, finger and grip;
- diminished vision to 20/50 in the right eye and 20/70 in the left eye;
- avoid concentrated exposure to extreme heat and cold, as well as unprotected

heights and dangerous machinery. (Tr. 63-64).

The VE testified that this person could not do plaintiff's past work due to the vision problems. (Tr. 64).

ALJ O'Blennis did not ask the VE whether the hypothetical person would be able to do other jobs. (Tr. 65-68). He indicated that he would send some interrogatories to a medical doctor to see if she met a Listing. (Tr. 70).

**3.    Medical Records**

Ms. Ford saw Dr. George Thampy for treatment of her diabetes prior to the alleged onset of disability. From June through December, 2005, his office records note that she had frequent and serious bouts of hypoglycemia (low blood sugar) and high blood sugar as measured by her HbA1c counts. She complained of blurred vision, excessive fatigue and paresthesia in her feet and hands. She was switched from injected insulin to an insulin pump in July, 2005. In December, the diagnosis was uncontrolled diabetes complicated by peripheral neuropathy. Her HbA1c counts had improved since going on the pump. She was noted to be morbidly obese. (Tr. 480 -492). In December, 2005, a nerve conduction study was negative for diabetic peripheral neuropathy. (Tr. 391-395).

Dr. Brij Vaid was plaintiff's primary care physician. He prepared an Attending Physician Statement for UnumProvident in May, 2006, in which he stated that Ms. Ford was hospitalized for one night on April 21, 2006. The form indicates that she had stopped working on April 21, 2006, due to her condition. The primary diagnoses were uncontrolled diabetes, chest pain and headache; a fourth diagnosis is illegible. (Tr. 430-431).

In April, May, June and October, 2006, Dr. Thampy again recorded a diagnosis of

diabetes, uncontrolled and complicated by peripheral neuropathy. (Tr. 494-501).

Dr. Vaid continued to see Ms. Ford through May, 2007. His records consist mostly of check-off forms with some handwriting on them. The records are difficult to read. Dr. Vaid repeatedly assessed her as having sleep apnea, GERD, diabetes and neuropathy. He prescribed various medications. He also noted complaints of headache, chest pain, palpations and abdominal pain. (Tr. 509-599).

Dr. Vittal Chapa performed a consultative physical examination of Ms. Ford on August 4, 2007. This was evidently done in connection with a prior application, although the ALJ did not note that she had previously applied for benefits. Dr. Chapa found that she had loss of pin prick sensation in her feet and legs. She had good hand grip and was able to perform both fine and gross manipulations with both hands. She said she had numbness in her fingertips. His impression was diabetes and diabetic peripheral neuropathy. (Tr. 614-618).

In August, 2007, Dr. Vaid noted that she had neuropathy in her hands and feet. (Tr. 647).

In March, 2008, Dr. Vaid assessed her with uncontrolled diabetes, neuropathy, migraine headache, elevated blood pressure and GERD. He noted that she did not want testing "due to $ & no ins[urance] - will go to ER if feels worse." (Tr. 705).

Dr. Anthony Margherita performed an independent medical examination at the request of Unum Life Insurance Company on June 11, 2008. The purpose of the examination was "to determine the patient's level of disability." (Tr. 669). On exam, Ms. Ford was 4'11" tall and weighed 190 pounds. Her blood sugar was 441. Examination of head, eyes, ears, nose and throat was normal. Her cardiovascular exam was benign. Her steps were halting, "consistent with a neuropathy," and she was unable to toe and heel walk. Her spine was essentially normal, except

that motion of her lumbar spine was limited due to her obesity.  On neurological exam, Dr. Margherita noted that her balance was poor.  She had significant abnormalities on sensory testing in that she had "sensory loss in a stocking glove distribution with a loss of sensation to all modalities (pin, touch, position, vibration, and temperature)."  Dr. Margherita wrote that these findings "were consistent with a large fiber neuropathy."   He also wrote that she had "clear evidence of significant neuropathic pain consistent with a peripheral neuropathy" and that her uncontrolled diabetes would likely worsen her neuropathy.  His review of the records suggested to him that she was no longer using the insulin pump due to inability to afford it, but he said the records were unclear on that point.  He opined that she would be unable to do sedentary work.  (Tr. 659-679).

       In July and August, 2008, Dr. Vaid added a diagnosis of osteoporosis.  (Tr. 685, 690).

       Ms. Ford returned to Dr. Thampy in September, 2008.  She had not seen him for almost 2 years.  Her HbA1c count was >14.0%, which corresponds to an average blood glucose of >400.  He again assessed her as having uncontrolled diabetes, complicated by peripheral neuropathy.  She was on injectable insulin.  As he usually noted on all visits, he discussed the consequences of uncontrolled diabetes and the role of diet, exercise and weight loss in the management of diabetes. He recommended that she quit smoking.  He also noted that she had no fine or coarse tremor in her extremities.  (Tr. 825-826).

       Dr. Adrian Feinerman performed a consultative physical examination of Ms. Ford on October 7, 2008.  The examination lasted 20 minutes.  Her complaints were pain and numbness in both feet and hands and blurred vision.  She was 4'11" tall and weighed 183 pounds.  She was able to tandem walk, walk on heels and toes, hop, squat and arise from a chair without difficulty.

Muscle strength was normal throughout.  Her grip strength was equal and strong.  Her finger tips were numb, but fine and gross manipulation were normal, including opposition of fingers and thumb.  (Tr. 812-820).

Plaintiff's primary care physician, Dr. Vaid, completed a report on April 21, 2009.  (Tr. 839-841).  This report was prepared on a check-off type form.  Dr. Vaid indicated that Ms. Ford had type 1 diabetes and that she had peripheral neuropathy involving her feet and legs, as shown by a 2006 EMG nerve conduction study.  He also indicated that she had a tremor in her hands which interfered 75% with use of her fingers, hands and arms.  He indicated that her medications resulted in side effects which could interfere with work, such as tiredness, inability to drive and gait disturbance.  He opined that she could not sustain any type of work activity on a full-time basis.

**4.**     **State Agency Consultant RFC Assessments**

On September 5, 2007, state agency consultant Lenore Gonzalez, M.D., assessed plaintiff's residual functional capacity (RFC) based on a review of medical records.  (Tr. 636-643).  She opined that plaintiff was able to perform the exertional functions of  light work except that she was limited in the use of her lower extremities due to diabetic peripheral neuropathy.  She assessed some postural limitations, but no manipulative limitations.   Dr. Gonzalez noted that Ms. Ford had numbness in her fingertips and loss of pinprick sensation in her lower extremities.  This assessment must have been done in connection with a prior application, since the present application was not filed until August, 2008.  The ALJ gave this assessment "considerable weight."  (Tr. 17).

On October 20, 2008, state agency consultant B. Rock Oh, M.D., assessed plaintiff's

residual functional capacity (RFC) based on a review of medical records. (Tr. 803-810). He opined that she was able to do light work with some non-exertional limitations. With regard to manipulative limitations, Dr. Oh opined that her ability to feel was limited, but concluded that she had unlimited ability to reach in all directions, handle (gross manipulations) and finger (fine manipulations). His remarks at this section of the RFC form are clearly based on Dr. Feinerman's report. See, Tr. 806. Dr. Oh's remarks in the last section of the form indicate that he reviewed Dr. Margherita's report as well as Dr. Feinerman's; he also reviewed a "treating source statement but no controlling weight was given." (Tr. 810). The ALJ referred to this assessment ("Exhibit 19F") at the hearing. (Tr. 63). However, he did not mention it in his written decision.

## Analysis

Plaintiff's first point is meritorious. The ALJ's decision at step 5 is not supported by substantial evidence.

The ALJ posed a hypothetical question to the VE, and asked her, based on those assumptions, whether the hypothetical person could do plaintiff's past work. The ALJ did not go on to question the VE as to whether the hypothetical person could do other work. Rather, he made his determination at step 5 by using the Grids.

There was a difference between the ALJ's findings as to plaintiff's limitations in his written decision and the limitations he posed to the VE in his hypothetical question at the hearing. In assessing plaintiff's RFC in his written decision, the ALJ said she could do light work with some limitations. One of those limitations was "She has some difficulty with the fingertips such that reaching, handling, and gripping would be diminished." (Tr. 14). However,

in the hypothetical question, the ALJ asked the VE to assume the following:

> And that person would have some diminution of the ability to - hold on a second - some in discriminating size, shape, and temperature and texture of certain items, small items, with the fingertips. And, but, the reaching and handling and fingering and gripping would all be undiminished.

Tr. 63-64.

Generally, the hypothetical question posed to the VE must include all of the limitations found by the ALJ to be credible. **O'Connor-Spinner v. Astrue, 627 F.3d 614, 619 (7th Cir., 2010), and cases cited therein.** Defendant does not argue to the contrary. Rather, he asks the Court to assume that the ALJ inadvertently misstated his RFC findings in his written decision. See, Doc. 29, pp. 7-8.

The discrepancy between the hypothetical and the written decision goes beyond a mere typographical or scrivener's error. Defendant offers no authority for his argument that this Court may disregard a clear statement in the written decision as to RFC in favor of a contrary statement made at the hearing. Although not precisely on point, the Seventh Circuit's repeated admonition that the ALJ's decision must be reviewed only on the basis of reasons given by the ALJ and not on after-the-fact rationalizations suggests otherwise. See, **McClesky v. Astrue, 606 F.3d 351, 354 (7th Cir. 2010) (It is "improper for an agency's lawyer to defend its decision on a ground that the agency had not relied on in its decision....."); Parker v. Astrue, 597 F.3d 920, 922 (7th Cir. 2010).** If the Court cannot uphold the ALJ's decision on a ground that the ALJ did not rely upon, it is doubtful whether the Court can uphold the ALJ based on an assumption that the ALJ meant to say the opposite of what he actually said.

In the posture of this case, whether Ms. Ford had a limitation in her ability to reach,

handle or grip is critical. The ALJ did not use VE evidence at step 5 in this case. Rather, he used the Grids to determine that Ms. Ford could do other work and was therefore not disabled.

Use of the Grids (20 C.F.R. Part 404, Subpart P, Appendix 2) rather than the testimony of a VE is appropriate where the claimant has no non-exertional limitations and has the RFC to do a full range of work at a specified exertional level. 20 C.F.R. Part 404, Subpart P, Appendix 2, §200.00(e). The Seventh Circuit has explained the use of the Grids as follows:

> The medical vocational guideline grids provide a means for ALJs to determine whether a person with a particular claimant's exertional limitation—standing, walking, lifting, and the like—can perform any jobs in the national economy. . . . The presence of other, non-exertional limitations, not factored into the grids, may preclude an ALJ from relying on the grids and require a consultation with a vocation expert, but only when the non-exertional limitations "substantially reduce a range of work an individual can perform." *Luna v. Shalala,* 22 F.3d 687, 691, 692 (7th Cir.1994).

***McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011).**

The Social Security Administration has determined that reaching and handling are required in almost all jobs, and fingering is required in most unskilled sedentary jobs. SSR 85-15, 1985 WL 56857, *7. "Significant limitations of reaching or handling, therefore, may eliminate a large number of occupations a person could otherwise do. Varying degrees of limitations would have different effects, and the assistance of a VS [vocational specialist, a/k/a vocational expert] may be needed to determine the effects of the limitations." *Ibid*.

Assuming that the ALJ meant what he said in his written decision, he found that Ms. Ford had diminished ability to reach, handle and grip. He did not specify the severity of her limitation. However, if significant enough, this non-exertional limitation would substantially reduce the range of light and sedentary work she was able to do, and the use of the Grids would be

inappropriate. In view of the importance of the issue, the Court cannot assume that the ALJ meant to say that she had *undiminished* ability rather than *diminished* ability to reach, handle and grip.

Plaintiff is also correct the ALJ erred in his credibility determination. The erroneous credibility determination obviously also supports plaintiff's additional argument that the ALJ did not include all limitations established by the evidence.

ALJ O'Blennis said that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 15).

The Seventh Circuit has repeatedly criticized the use of similar "boilerplate" language to express the ALJ's credibility findings. In ***Parker v. Astrue*, 597 F.3d 920, 921-922 (7th Cir. 2010)**, the Court called it "meaningless boilerplate" because it does not communicate what weight the ALJ actually gave to the claimant's statements. Here, despite the fact that he believed that her "medically determinable impairments could reasonably be expected to cause the alleged symptoms," the ALJ did not believe everything that Ms. Ford said about the extent of her symptoms. However, he did not specify which of her statements he did not believe, and did not adequately explain why did not believe them. Such an analysis is inadequate. See, ***Martinez v. Astrue*, 630 F.3d 693, 694-696 (7th Cir. 2011)**.

The problem is compounded by the fact that the ALJ rejected Ms. Ford's statements to the extent that they did not mesh with his findings as to RFC. This approach "turns the

credibility determination process on its head by finding statements that support the ruling credible and rejecting those statements that do not, rather than evaluating the [claimant's] credibility as an initial matter in order to come to a decision on the merits." ***Brindisi v. Barnhart***, 315 F.3d 783, 787-788 (7th Cir. 2003).

The determination of a plaintiff's credibility is often critical because the assessment of her ability to work will often "depend heavily on the credibility of her statements concerning 'the intensity, persistence and limiting effects' of her symptoms...." ***Bjornson v. Astrue***, **671 F.3d 640, 645 (7th Cir. 2012).** However, the boilerplate language used by ALJ O'Blennis wrongly "implies that the determination of credibility is deferred until ability to work is assessed without regard to credibility, even though it often can't be." ***Id.*, at 645-646.**

This Court is not suggesting that the ALJ's use of the above boilerplate language is necessarily fatal. The ALJ's decision might pass muster had he gone on to support his credibility findings with a sufficient articulation of how the record contradicts the claimant's statements. ALJ O'Blennis did not do so here.

The ALJ misstated the record in explaining his credibility findings. Hr first noted that Ms. Ford alleged she became disabled as of April 20, 2006, but the "record fails to document that any specific medical event occurred on that date." (Tr. 15). However, Dr. Vaid indicated that she was hospitalized overnight on April 21, 2006, after which she did not return to work. (Tr. 430-431). The ALJ also said that there was no indication that Ms. Ford's access to medical care had been restricted because of inability to pay. (Tr. 16). However, Dr. Vaid noted that she did not have insurance and could not pay for testing. See, Tr. 705. Rather than contradicting her testimony, this evidence corroborated it.

In short, the ALJ's credibility analysis consisted largely of the boilerplate statement

quoted above and picking apart her testimony based on a mistaken view of the evidence. This is inadequate. **See,** *McClesky v. Astrue*, **606 F.3d 351 (7th Cir. 2010)**.

The above errors require that this case be remanded. It should be clear that this Court is not making any suggestion as to whether plaintiff is, in fact, disabled, or as to what the ALJ's decision should be on reconsideration. This Court has formed no opinions in that regard.

Remand of a social security case can be ordered pursuant to sentence four or sentence six of 42 U.S.C. § 405(g). A sentence four remand depends upon a finding of error, and is itself a final, appealable order. In contrast, a sentence six remand is for the purpose of receipt of new evidence, but does not determine whether the Commissioner's decision as rendered was correct. A sentence six remand is not an appealable order. **See,** *Perlman v. Swiss Bank Corporation Comprehensive Disability Protection Plan*, **195 F.3d 975, 978 (7th Cir. 1999).**

Here, a sentence four remand is appropriate.

### Recommendation

This Court recommends that the Commissioner's final decision be **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence **four** of **42 U.S.C. §405(g).**

Objections to this Report and Recommendation must be filed on or before **June 25, 2012**.

**Submitted: June 8, 2012.**

s/ Clifford J. Proud
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**